# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Hockey Enterprises, Inc.                                    Civil No. 10-2943 (DWF/JSM)

               Plaintiff,

v.                                                         **MEMORANDUM**
                                                       **OPINION AND ORDER**

Dean Talafous,
and Brian McKinney,

               Defendants.

_____

J. Mark Dady, Esq., J. Michael Dady, Esq., and Kristy L. Zastrow, Esq., Dady & Gardner, PA, counsel for Plaintiff.

Jessica L. Sanborn, Esq., Matthew J. Schaap, Esq., and Robert B. Bauer, Esq., Dougherty, Molenda, Solfest, Hills & Bauer PA, counsel for Defendant Brian McKinney.

Dean Talafous, *Pro Se*, Defendant.

_____

## INTRODUCTION

This matter is before the Court on a Motion for Summary Judgment brought by Defendant Brian McKinney. (Doc. No. 86.) For the reasons set forth below, the Court grants the motion in part and denies it in part.

## BACKGROUND

Plaintiff Hockey Enterprises, Inc. ("HEI") is a former franchisee doing business in Florida. (Doc. No. 11, First Am. Compl. ¶ 2; Doc. No. 58, Answer ¶ 2.) Mathieu

Comeau, formerly a plaintiff in this action, is the owner/guarantor of HEI.[1]  (Doc. No. 100, Zastrow Aff, Ex. 1, Comeau Dep. at 22.)

Total Hockey Worldwide and Total Hockey Products (together, "Total Hockey") are Minnesota limited liability companies.  (Doc. No. 100, Exs. 4, 13.)  Total Hockey Worldwide is a franchisor that markets and sells a business concept for operating hockey-training franchises.  (Doc. No. 98, Comeau Aff., Ex. 1 at 1.)  Total Hockey Products is in the business of licensing hockey training protocols, procedures, and standards, and selling hockey training equipment.  (*Id*.)  Total Hockey Products is the sole owner of Total Hockey Worldwide.  (*Id*.)

Defendant Dean Talafous is the President and owner of Total Hockey Worldwide. (*Id*.; Zastrow Aff., Ex. 2, Talafous Dep. at 8.)  In 2007, Defendant Brian McKinney was a Vice President and an owner of Total Hockey Worldwide.  (Doc. No. 89, McKinney Decl. ¶ 10.)  His role was director of engineering and research.[2]  (*Id*.)  McKinney is currently an owner and the Vice President of Product Development and Support of Fan-Tastic Sports, and is also an owner of Total Hockey of Minnesota, located in Lakeville, Minnesota.  (*Id*.)

Comeau saw an advertisement in *USA Hockey Magazine* for Total Hockey in January 2007, and the advertisement sparked an interest that led him to Total Hockey's

---

[1]     Comeau was dismissed without prejudice as a party to this action pursuant to this Court's January 10, 2011 order.  (Doc. No. 53.)

[2]     When referring only to movant Defendant, the Court will simply refer to "McKinney."

website.  (Comeau Aff. ¶ 5, Ex. 2; Comeau Dep. at 26, 27.)  The Total Hockey website represented that Total Hockey would "provide[] the equipment, technology, materials, training, protocols and experience to successfully launch an independent, profitable, hockey-related business" and that Total Hockey would provide a "business plan with year-round profitability."  (Comeau Aff. ¶ 7; Ex. 3.)

After viewing the website, Comeau contacted Rob Talafous, Vice President and Secretary of Total Hockey Worldwide, to discuss the Total Hockey business opportunity.  (Comeau Aff. ¶ 8.)  Comeau expressed that he was concerned about his own lack of hockey experience, and he alleges that Dean Talafous expressed that he shared his concern.  (*Id*. ¶ 8, 9)  Comeau then found Denis Potvin, an NHL Hall of Famer, to help run Comeau's facility for a salary, and both Dean and Rob Talafous allegedly assured Comeau that he could operate a successful Total Hockey franchise if he partnered with or hired someone with a strong hockey background. [3]  (*Id*.)

Comeau alleges that, as part of his due diligence, he asked Total Hockey several specific questions, including:  "What will I get when I buy into this business opportunity?"; "What is my gross revenue going to be?"; and "What are Total Hockey's plans for the future, long term?"  (*Id*. ¶ 10.)  Comeau asserts that Total Hockey answered these questions with the representations detailed below.

---

[3]     Denis Potvin's involvement in the Florida facility amounted to a contract for four hours of appearances per month.  (Comeau Dep. at 337.)

Comeau received an e-mail from Rob Talafous on or around March 28, 2007, with a Revenue and Expense Projection Worksheet (the "Projection Worksheet") attached.  (*Id.*, Ex. 4.)  Rob Talafous's e-mail stated that the Projection Worksheet attached was a template "simply for your convenience in putting in projected number of players or teams and pricing.  This is only for guide purposes and is not a guarantee or projection of results by THTS."  (*Id.*)  The Projection Worksheet included financial projections by season and included a total annual revenue estimate of $437,000 and an annual profit estimate of $139,600.  (*Id.*)  The Projection Worksheet also contained the following information:

> *Disclaimer.*  This is a projection template and does not guarantee the results projected on this worksheet.  ***Plug in projected number of players or team sessions and anticipated rates.  Use hourly ice time rental rates for guide in pricing team training and build individual training rates from there.***

(*Id.*)  Comeau argues that despite the disclaimer, the Projection Worksheet constitutes a false earnings claim.

Comeau alleges that Rob Talafous informed him that he would receive a profitable and proven business model from Total Hockey that would provide Comeau with the tools needed to run a successful franchise.  (Comeau Aff. ¶ 11.)  Comeau further alleges that Total Hockey told Comeau that Total Hockey was expanding in North America and that the expansion would increase brand recognition.  (*Id.* ¶ 13.)

Comeau traveled to Minnesota in or around April 2007.  (Comeau Dep. at 40; Comeau Aff. ¶ 15.)  During this trip, Comeau met face-to-face with Rob Talafous, Dean Talafous, and Brian McKinney.  (Comeau Dep. at 40–44.)  Comeau also toured the

Talafouses' and McKinney's hockey training facilities, as well as the facility associated with the late Herb Brooks, coach of the 1980 U.S. Olympic gold medal team.  (*Id*. at 41, 44, 54.)  During the visit, Comeau alleges that he inquired about the financial status of these and three other Total Hockey facilities and that Rob Talafous and Brian McKinney told Comeau that the facilities were successful and profitable.  (*Id*. at 60, 61; Comeau Aff. ¶¶ 22, 23.)

Comeau specifically alleges that McKinney made representations to Comeau, including:  (1) that the Projection Worksheet was reflective of what typical Total Hockey training centers were actually generating; and (2) that Comeau's center should be able to meet the numbers in the Projection Worksheet, and that he would have an even easier time meeting the projected numbers than existing centers, due to "better technology, synergy, and the involvement and association with NHL players in the Total Hockey System."  (*Id.* ¶¶ 16–23.)

McKinney argues that he had no role in creating or distributing the Projection Worksheet to potential franchisees, that he had little to no personal knowledge of the financial information of the other operating Total Hockey centers (with the exception of his own franchise), and that his role at Total Hockey did not require him to have any such information.  (McKinney Decl. ¶¶ 18–21.)  McKinney recalls Comeau's visit to Minnesota, and alleges that his conversations with Comeau centered on the equipment and the layout of the training facility.  (*Id.* ¶¶ 23, 26.)  He bases this recollection, however, on his general practice of dealing with prospective franchisees, rather than a specific recollection of his communication with Comeau.  (McKinney Dep. at 216, 217;

*see also* McKinney Decl. ¶ 23.)  McKinney alleges that he remembers that Comeau did not bring the Projection Worksheet with him during his visit to the Lakeville facility in April 2007, and that he does not recall discussing it with him during the visit. (McKinney Decl. ¶ 24.)  Comeau confirms that he did not have the Projection Worksheet in hand during the visit.  (Comeau Dep. at 101.)

After Comeau's visit to Minnesota, he began looking for a potential location for a training facility in Florida.  (Comeau Aff. ¶ 25.)  Comeau alleges that while Total Hockey suggested that an ideal training facility would be near or inside a rink or available ice, neither Total Hockey nor McKinney individually ever stated that such a location was vital to the profitability of the center.  (*Id.* ¶ 26.)

Comeau returned to Minnesota along with his wife and child in July 2007, where he visited McKinney's facility in Lakeville, Minnesota.  (Comeau Dep. at 147, 148.) Comeau alleges that he repeated the financial questions he asked during his April 2007 visit to McKinney, and that McKinney again assured Comeau that if he followed the Total Hockey protocols, he would achieve profitable results.  (Comeau Dep. 151, 160; Comeau Aff. ¶ 29.)  According to Comeau, McKinney represented that his Lakeville facility's programs were filling up fast, and that the center was "moving along on target with its anticipated projection."  (Comeau Decl. ¶ 30.)

On or about July 27, 2007, Total Hockey provided Comeau with a Uniform Franchise Offering Circular ("UFOC").  (McKinney Decl., Ex. 1.)  The UFOC contained the following language:

We do not furnish or authorize any salesperson to furnish any oral or written information concerning the actual or potential sales, costs, income, or profits of a Total Hockey™ franchise.  Actual results vary from unit to unit and we cannot estimate the results of any particular franchise.  We have not suggested, and certainly cannot guarantee, that you will succeed in the operation of your Training Center, because the most important factors in the success of any Training Center, including the one to be operated by you, are your personal business acumen, marketing, management, judgment and other skills and your willingness to work hard and follow the System.

WE DO NOT MAKE ANY PROMISES OR REPRESENTATION OF ANY KIND THAT YOU WILL ACHIEVE ANY PARTICULAR RESULTS OR LEVEL OF SALES OR PROFITABILITY OR EVEN ACHIEVE BREAK-EVEN RESULTS IN ANY PARTICULAR YEAR OF OPERATIONS.  THE PROFITABILITY OF ANY INDIVIDUAL TRAINING CENTER DEPENDS ON A NUMBER OF FACTORS THAT MAY VARY DUE TO INDIVIDUAL CHARACTERISTICS OF THE FRANCHISED BUSINESS.

YOU ARE RESPONSIBLE FOR DEVELOPING YOUR OWN BUSINESS PLAN FOR YOUR TRAINING CENTER INCLUDING CAPITAL BUDGETS, FINANCIAL STATEMENTS, PROJECTIONS AND OTHER ELEMENTS APPROPRIATE TO YOUR PARTICULAR CIRCUMSTANCES. WE ENCOURAGE YOU TO CONSULT WITH YOUR OWN ACCOUNTING, BUSINESS, AND LEGAL ADVISORS TO ASSIST YOU TO IDENTIFY THE EXPENSES YOU LIKELY WILL INCUR IN CONNECTION WITH YOUR TRAINING CENTER, TO PREPARE YOUR BUDGET, AND TO ASSESS THE LIKELY OR POTENTIAL FINANCIAL PERFORMANCE OF YOUR TRAINING CENTER.

IN DEVELOPING THE BUSINESS PLAN FOR YOUR TRAINING CENTER, YOU ARE CAUTIONED TO MAKE NECESSARY ALLOWANCE FOR CHANGES IN FINANCIAL RESULTS TO INCOME, EXPENSES, OR BOTH, THAT MAY RESULT FROM OPERATION OF YOUR TRAINING CENTER DURING PERIOD OF, OR IN GEOGRAPHIC AREAS SUFFERING FROM, ECONOMIC DOWNTURNS, INFLATION, UNEMPLOYMENT OR OTHER NEGATIVE ECONOMIC INFLUENCES.

(*Id.*)  Comeau also filled out a Franchise Questionnaire.  (Comeau Dep. at 309-314.)

On July 13, 2007, HEI and Total Hockey entered into two franchise agreements, one for an East Florida location and the other for a West Florida location.  (Comeau Aff. ¶ 33; First Am. Compl., Exs. D & E.)  Both agreements provide, in part:

> BACKGROUND:  D. You have had an adequate opportunity to be thoroughly advised of the provisions of this Agreement and have had sufficient time and opportunity to evaluate and investigate the TOTAL HOCKEY system and the procedures and financial requirements associated with this system as well as the competitive market in which it operates.
>
> . . .
>
> 6.A.   Facilities.  You are responsible for purchasing or leasing a site that meets our site selection criteria.  Our approval of the location (or construction) of your site does not constitute a representation, a guaranty or warranty, express or implied, assurance or endorsement of the successful operation, profitability, safety and/or legal compliance of the Training Center operated at such location, and you alone are responsible for site selection and the ultimate operation and success of the Training Center.
>
> . . .
>
> 16E.   Integration /Waiver. . . . This Agreement, together with its Appendices constitute the entire agreement between the parties regarding the subject matter of this Agreement and embody and supersede all prior agreements and negotiations regarding this subject matter. . . . All of the representations and warranties of each party regarding the subject matter of this Agreement are set forth in this Agreement.  You acknowledge and agree that you have not received any warranty or guarantee, express or implied, as to the potential volume, profits or success of your business.  Each party acknowledges and agrees that it has not been induced to enter into this Agreement by, and has not in any way relied upon, any representation or warranty, written or oral, express or implied, of the other party except as expressly stated in this Agreement.

(*Id.*)

In March 2008, Comeau found the location for HEI's East Florida location. (Comeau Aff. ¶ 42.)  The monthly rent was $8,000.  (*Id.*)  Comeau discussed the space and rent with Dean Talafous prior to signing the lease.  (*Id.*)  Comeau alleges that Dean Talafous did not indicate that he considered the rent to be too high or an impediment to Comeau's ability to operate a profitable franchise.  (*Id.* ¶ 43.)  On behalf of HEI, Comeau entered into a lease for the space in April 2008.  (*Id.* ¶ 44.)

HEI opened for business in December 2008 but was closed in February 2010, as it "did not come anywhere close" to the revenue projection Total Hockey allegedly represented that HEI could expect.  (Comeau Dep. at 180, 189, 190; Comeau Aff. ¶ 46.) HEI never opened its West Florida franchise.  (Answer ¶ 33.)  Comeau contends that, after signing the Franchise Agreements and experiencing an operating loss in excess of $250,000, it discovered that Defendants made several false representations.  (Comeau Aff. ¶ 48.)  Specifically, Comeau contends that, contrary to what he had been told by Total Hockey and/or its representatives, profit and loss statements indicate that the numbers on the proforma were not in fact reflective of the revenues, expenses, and cashflows that existing Total Hockey facilities were experiencing.  (Zastrow Aff., Exs. 7–9; D. Talafous Dep. 43, 44.)  Further, McKinney later admitted that he was not aware of any existing facilities that generated $437,000 or more in revenue or $139,600 or more in net profit.  (McKinney Dep. 187, 188.)

HEI initially alleged:  (1) a violation of the Minnesota Franchise Act for misrepresentations and illegal earnings claims; (2) a violation of the Minnesota

Franchise Act for failure to register; (3) a violation of the Florida Franchise Misrepresentation Act; (4) fraud; (5) negligent misrepresentation; and (6) breach of contract and the implied covenant of good faith and fair dealing. (First Am. Compl. at 9–19.) On January 10, 2011, this Court dismissed Comeau without prejudice as a plaintiff in this action, and dismissed Defendants Peter Ing and Bryce Salvador with prejudice. (Doc. No. 53 at 24.) The Court also granted the Total Hockey Defendants' motion to dismiss both of Plaintiffs' Minnesota Franchise Act claims with prejudice, as well as Plaintiffs' claims for breach of contract and implied covenant of good faith and fair dealing. (*Id.*) HEI's claims for fraud, negligent misrepresentation, and violation of the Florida Franchise Act survived the motion to dismiss. (*Id.*) While the Court allowed a large part of HEI's claims to survive, the Court cautioned HEI "that a victory at this early stage does not necessarily equate to a victory at the summary judgment stage," and indicated that "without significant developments during discovery, [HEI's] claims are at risk of failing in a future round of dispositive motions." (*Id.*)

McKinney argues that discovery has revealed no further evidence beyond "mere allegations" that he made any statements regarding the profitability of Total Hockey Centers. McKinney asserts that there is no evidence that he knew or should have known about Total Hockey centers' profitability, nor that he was aware of any failing Total Hockey centers as of April or July of 2007. (Doc. No. 88 at 3.) For these reasons, McKinney requests that the Court grant his motion for summary judgment and dismiss HEI's remaining claims against him.

## DISCUSSION

### I.      Legal Standard

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

### II.     Fraud and Negligent Misrepresentation

In Counts IV and V of the First Amended Complaint, HEI asserts claims of fraud and negligent misrepresentation.  These claims are based on the following alleged

representations by McKinney:  (1) the suggestion in the Projection Worksheet that HEI could generate $400,000 in annual revenue; (2) that it was *not* imperative for the facility to be located in or very near an ice rink; (3) that Total Hockey's other facilities were financially successful; (4) that it was not necessary for Comeau to have significant hockey experience; (5) that Total Hockey had been experiencing growth; and (6) that Total Hockey had an established business plan for running hockey facilities.  (First Am. Compl. ¶ 34.)[4]

In August 19, 2007, approximately one month *after* Comeau visited Minnesota and HEI entered into its Franchise Agreements, McKinney received an e-mail from Dean Talafous indicating that Total Hockey's facility in St. Louis might be closing and expressing concern that the company could go bankrupt.  (McKinney Dep. 325, 326; Zastrow Aff., Ex. 5.)  Comeau argues that McKinney's receipt of this communication in August leaves "no question" that "McKinney knew these material facts [in July] and failed to disclose this information to HEI at a time when it could have saved itself hundreds of thousands of dollars."  (Doc. No. 96 at 13.)  Accordingly, Comeau argues, McKinney failed to disclose material facts that, had he known, would have prevented

---

[4]     HEI also asserts that Total Hockey representatives, including McKinney, made several material omissions by failing to inform Comeau that (1) a number of Total Hockey facilities were in financial trouble or failing; (2) that it was imperative to locate the facility in or very near an ice rink; (3) that Comeau needed to have significant hockey experience in order to be profitable; and (4) that the financial projections presented to Comeau were unrealistic.  (Doc. No. 96 at 12–16.)

HEI from entering the Franchise Agreements and incurring operating losses.  (*Id.*; Comeau Aff. ¶ 49.)

McKinney argues that there is no evidence that McKinney knew or should have known of the profitability of Total Hockey centers, nor is there evidence that the Total Hockey centers were "failing" in April or July of 2007.  (Doc. No. 88 at 2.)

### a.    Choice of Law for HEI's Common Law Claims

HEI argues that Minnesota law applies to its common law claims and defenses, reasoning that McKinney was not a party to the Franchise Agreement between HEI and Total Hockey, and that therefore the Franchise Agreement's choice of law provision, which provides for the application of Florida law, does not apply.  (Doc. No. 96 at 17.) McKinney counters that Florida law applies to the claims of fraudulent and negligent misrepresentation.  (Doc. No. 88 at 25–37.)

In a diversity case, the Court applies the forum state's choice-of-law analysis. *Birnstill v. Home Sav. of Am.*, 907 F.2d 795, 797 (8th Cir. 1990).  First, however, the Court must determine whether a conflict exists between the laws of the two forums. *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins. Co.*, 604 N.W.2d 91, 93–94 (Minn. 2000). "A conflict exists if the choice of one forum's law over the other will determine the outcome of the case."  *Id.* at 94.  As the Court indicated at the hearing on the motion for summary judgment, the issue of choice of law is not dispositive in this case.  Therefore, the Court applies Florida law, consistent with its analysis of the prior motion to dismiss.

**b.      Fraud**

Under Florida law, the elements of fraud are:  "(1) a false statement regarding a material fact; (2) the statement maker's knowledge that the representation is false; (3) intent that the representation induces another's reliance; and (4) consequent injury to the party acting in reliance."  *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1315 (11th Cir. 2007).

HEI's allegation that McKinney made false statements concerning the financial success of existing facilities, if true, would qualify as false statements regarding a material fact, as HEI has submitted evidence that the financial success of existing facilities, the Projection Worksheet, and the statements McKinney made to Comeau were pivotal determinative factors in Comeau's decision to open a franchise.  (Comeau Aff. ¶¶  31, 32.)  HEI also argues that McKinney knew that his representations were false.  In support of this assertion, HEI introduced into evidence an e-mail from Dean Talafous written in August 2007 indicating that the St. Louis facility would likely be closing, and worrying that the company could go bankrupt.  (McKinney Dep. 325, 326; Zastrow Aff., Ex. 5.)  HEI attempts to impute this knowledge to McKinney by arguing that "it is highly unlikely that these developments occurred overnight," and that Total Hockey must have been experiencing financial struggles one month earlier, when McKinney allegedly assured Comeau that the existing centers were doing well financially.  (Doc. No. 96 at 12, 13.)  However, HEI has not introduced any evidence beyond a bare assumption showing that Total Hockey was in trouble financially in April or July 2007, or that McKinney knew of this financial trouble.  When asked in his

deposition, "[W]as it your understanding that Mr. McKinney had anything more than

sort of an experiential as opposed to a—an actual financial knowledge of how Rob or

Dean or Herb Brooks were doing?," Comeau replied, "I believe he knew." (Comeau

Dep. at 67.)  When further probed about any evidence he could produce to support his

belief, Comeau responded, "I don't have a document, but when you ask somebody

straight in the eyes, you expect him to tell you the truth." (*Id.* at 67, 68.)  When further

asked whether Comeau had any evidence that McKinney knew he was making a false

statement, Comeau replied, "No, I don't have evidence other than—I didn't ask for

evidence.  He told me.  Why would I need to ask?  If somebody tells you something, you

believe in them." (*Id.* at 73.)  Without any further evidence to support the allegation that

McKinney knew his representations were false, or that he intended that his

representations induce Comeau's reliance, the Court grants McKinney's motion for

summary judgment on HEI's common law fraud claim as it is asserted against him.

   c.     **Negligent Misrepresentation**

   Under Florida law, the elements of negligent misrepresentation are:  "(1) [a]

misrepresentation of a material fact; (2) the representor . . . made the representation

without knowledge as to its truth or falsity, or . . . under circumstances in which he

ought to have known of its falsity; (3) the representor . . . intended that the

misrepresentation induce another to act on it; [and] (4) injury must result to the party

acting in justifiable reliance on the misrepresentation."  *Souran v. Travelers Ins. Co.*,

982 F.2d 1497, 1503 (11th Cir. 1993).

McKinney asserts that, in light of the language of the Franchise Agreements, the UFOC, and the franchise questionnaire, Comeau could not have justifiably relied on any of McKinney's alleged misrepresentations.  McKinney specifically argues that this is true because any alleged misrepresentations are addressed and contradicted by the terms of the parties' Franchise Agreements.  Specifically, McKinney cites to the portions of the agreements that read:

> BACKGROUND:  D. You have had an adequate opportunity to be thoroughly advised of the provisions of this Agreement and have had sufficient time and opportunity to evaluate and investigate the TOTAL HOCKEY system and the procedures and financial requirements associated with this system as well as the competitive market in which it operates.
>
> . . .
>
> 6.A.    Facilities.  You are responsible for purchasing or leasing a site that meets our site selection criteria.  Our approval of the location (or construction) of your site does not constitute a representation, a guaranty or warranty, express or implied, assurance or endorsement of the successful operation, profitability, safety and/or legal compliance of the Training Center operated at such location, and you alone are responsible for site selection and the ultimate operation and success of the Training Center.
>
> . . .
>
> 16E.    Integration /Waiver . . . This Agreement, together with its Appendices constitute the entire agreement between the parties regarding the subject matter of this Agreement and embody and supersede all prior agreements and negotiations regarding this subject matter. . . . All of the representations and warranties of each party regarding the subject matter of this Agreement are set forth in this Agreement.  You acknowledge and agree that you have not received any warranty or guarantee, express or implied, as to the potential volume, profits or success of your business. Each party acknowledges and agrees that it has not been induced to enter into this Agreement by, and has not in any way relied upon, any representation or warranty, written or oral, express or implied, of the other party except as expressly stated in this Agreement.

(First Am. Compl. ¶ 30, Exs. D & E.)

McKinney also relies on the language of the UFOC and the Franchise Questionnaire discussed above.  Comeau answered "no" to Questions 10, 11, and 12 of the Franchise Questionnaire, stating that no employee or other person speaking on behalf of the Franchisor had made any statement or promise to him concerning the total amount of revenue he would receive, or the costs involved.  (Comeau Dep. at 310–314.) McKinney argues that had Comeau answered "yes" and disclosed his prior conversations and the Projection Worksheet he received, Total Hockey "would have investigated what specific representations were made, and would most likely not have entered into a Franchise Agreement with HEI."  (Doc. No. 88 at ¶ 35; Talafous Decl. ¶ 23.)  While Comeau provided false answers, he contends that Rob Talafous told Comeau that "if [he] wanted the franchise, he had to answer, 'No'" to these questions. (Comeau Aff. ¶¶ 34–37.)  However, a reasonable jury could conclude that Comeau's false answers to the Questionnaire did not in fact mislead Total Hockey, and thus, his claims are not barred as a result.

Under Florida law, "justifiable reliance" is a necessary element of a negligent misrepresentation claim.  *See Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 607 F.3d 742, 747 (11th Cir. 2010) (applying Florida law); *Rose v. ADT Serv's, Inc.*, 989 So.2d 1244, 1247 (Fla. Dist. Ct. App. 2008).  The Court acknowledges that the agreements between the parties, which contain both disclaimer and integration clauses,

present evidence that could refute the reasonableness of Comeau's reliance on the alleged misrepresentations.  This is an issue of fact for the jury.

However, viewing the evidence in the light most favorable to HEI, the Court also concludes that a genuine issue of material fact exists as to whether McKinney made representations to Comeau without knowledge as to their truth or falsity, or under circumstances in which McKinney ought to have known of their falsity, therefore giving rise to a potential claim for negligent misrepresentation.  A reasonable jury could find that Comeau had reason to believe that McKinney, as an engineer and part owner of Total Hockey, would know of the financial situation of the franchisor.  "One who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining the information."  *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503, 1505 (11th Cir. 1993) (quoting Restatement (Second) of Torts § 552 (1977)).

Under Florida's negligent misrepresentation statute, a reasonable jury could also find that McKinney had a duty not to make representations under circumstances in which he *ought to have known* of their falsity.  "A representation made with an honest belief in its truth may still be negligent, because of lack of reasonable care in ascertaining the facts, or in the manner of expression, or absence of the skill and competence required by a particular business or profession."  *Souran*, 982 F.2d at 1503 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 107, at 745

18

(5th ed. 1984.))  A reasonable jury could find that, as an engineer and part owner of

Total Hockey, and an owner of his own franchise, McKinney had a duty to tell Comeau

that he did not have sufficient information to comment on Total Hockey's financial

success, or at least had a duty not to make statements to Comeau indicating that his

franchise would be as financially successful, if not more financially successful, than

existing facilities, without using reasonable care in ascertaining the real financial

condition of existing facilities.  If McKinney truly had no information regarding Total

Hockey's financial condition, McKinney arguably had a responsibility, as part owner of

the franchisor with whom Comeau was considering opening a franchise, to say that he

did not have that information to avoid liability.

        Genuine issues of material fact remain as to whether McKinney made these

statements at minimum without knowledge of their truth or falsity.  Therefore,

McKinney's motion for summary judgment on HEI's negligent misrepresentation claim

is properly denied.

## III.    Florida Franchise Act

        In Count III of the First Amended Complaint, HEI alleges that McKinney has

violated the Florida Franchise Act ("FFA").  Fla. Stat. § 817.416.  The Act makes it

unlawful, "when selling or establishing a franchise or distributorship, for any person:

> (1)    Intentionally to misrepresent the prospects or chances for success of
>         a proposed or existing franchise or distributorship;
>
> (2)    Intentionally to misrepresent, by failure to disclose or otherwise, the
>        known required total investment for such franchise or
>        distributorship; or

(3)     Intentionally to misrepresent or fail to disclose efforts to sell or establish more franchises or distributorships than is reasonable to expect the market or market area for the particular franchise or distributorship to sustain."

Fla. Stat. § 817.416(2)(a).  McKinney argues that the FFA does not apply to him because he was not a party to the Franchise Agreement and "was not personally selling a Total Hockey franchise to Comeau."  (Doc. No. 88 at 25.)  The Court disagrees.  The FFA defines a "person" for purposes of the Act as "an individual, partnership, corporation, association, or other entity doing business in Florida."  Fla. Stat. § 817.416(1)(a).  While the parties do not dispute that McKinney was not a party to the Franchise Agreement, McKinney was indeed doing business in Florida.  Courts interpreting "doing business" under the FFA have considered the Florida Long Arm Statute, which states that any person "operating, conducting, engaging in, or carrying on a business or business venture in" the state of Florida submits himself to the jurisdiction of the state of Florida. Fla. Stat. § 48.193(1)(a).  *See Burger King Corp. v. Austin*, 805 F. Supp. 1007, 1023 (S.D. Fla. 1992).  In this case, McKinney was an owner and franchisee of Total Hockey, he personally travelled to Florida to assist with the establishment of the HEI franchise, and he received monetary compensation for doing so.  (McKinney Dep. 130, 142, 43.) As such, McKinney qualifies as a "person" doing business in Florida for purposes of the FFA.

HEI argues that McKinney can be held individually liable for a violation of the FFA because he personally made affirmative misrepresentations to HEI regarding HEI's chances for success as a proposed franchise.  (Doc. No. 96 at 31, 32.)  *See Checkers*

*Drive-In Rests., Inc. v. Tampa Checkmate Food Serv., Inc.*, 805 So.2d 941, 944 (Fla. Dist. Ct. App. 2001) (holding that a franchisor's principals could be liable under the FFA if they personally participated in the alleged misconduct).

HEI alleges that McKinney made intentional misrepresentations to Comeau with the intent to induce him to invest time and money to establish a Total Hockey franchise. Under the FFA, the showing required to recover damages after a defendant allegedly "intentionally . . . misrepresent[s] the prospects or chances for success of a proposed or existing franchise or distributorship" is not the same as in an action for common law fraud. *Travelodge Int'l v. E. Inns*, 382 So. 2d 789, 790 (Fla. Dist. Ct. App. 1980). The statute does not require "proof of a deliberate and intentional false statement of material existing fact." *Id.* at 791. Rather, "[r]ecovery under the statute may be had upon proof of intentional words or conduct by the franchisor, concerning the prospects or chances of success of the enterprise, which were relied upon by the franchisee to his detriment, and which are not in accordance with the facts." *Id.*

In this case, HEI has submitted evidence that McKinney: (1) told Comeau that the Total Hockey centers were doing well financially and represented that the Projection Worksheet was based on what existing, typical Total Hockey centers were actually experiencing; (2) failed to disclose that the Total Hockey centers were struggling financially or that the St. Louis facility was closing; (3) represented to Comeau that HEI should do well financially, and would likely do even better than existing centers because

of better technology, synergy, and the association with NHL players; and (4) indicated that proximity to an ice rink was not vital to the success of a Total Hockey franchise.[5] (Doc. No. 88 at 26; Doc. No. 96 at 33, 34.)  Comeau asserts that the Projection Worksheet he received was pivotal to his decision to enter into a Franchise Agreement with Total Hockey.  (Comeau Aff. ¶¶ 31, 32, 49.)  Comeau concedes that he relied upon the Projection Worksheet and the responses of the Total Hockey owners instead of independently reviewing the financial documents of the actual existing Total Hockey franchise centers.  (Comeau Dep. at 101, 142, 146.)

McKinney argues that there is no evidence that McKinney made any statements regarding the profitability of the Total Hockey centers, that there is no evidence McKinney knew or should have known of the profitability of the Total Hockey centers, and that there is no evidence that any of the Total Hockey centers were failing in April or July 2007.  McKinney explains that, as an engineer, he did not develop or distribute the Projection Worksheet to potential franchisees, and that he had little to no personal knowledge of the financial information of the other Total Hockey centers.  (McKinney Aff. ¶¶ 16, 19, 20.)

Viewing the evidence in the light most favorable to HEI, there remains a genuine issue of material fact as to whether McKinney's representations in April and July 2007 violated the FFA, and accordingly, a reasonable jury could return a verdict for HEI on

---

[5]       McKinney maintains that he does not believe that on-site ice access is essential to the success of a Total Hockey facility, although access to ice is an important factor to success.  (McKinney Decl. ¶ 15.)

this count.  McKinney stated in his deposition that he had a difficult time remembering specific conversations with Comeau and that he based his testimony on general recollections of conversations with prospective franchisees.  (McKinney Dep. at 216, 217.)  McKinney maintains that he had little to no personal knowledge of the financial circumstances of other Total Hockey centers.  However, according to Comeau, McKinney also did not represent to Comeau that he lacked knowledge surrounding the financial circumstances of existing centers, nor did he decline to discuss the prospects for success of HEI's proposed franchise.  A reasonable jury could find that to a potential franchisee, McKinney, who was an engineer who worked with the facilities' technology, an owner of the franchisor company, and a part-owner of his own Total Hockey center, was in a position to represent the financial conditions of Total Hockey.  If McKinney made the representations that HEI alleges, these statements satisfy the first prong of the FFA.  As such, McKinney's motion for summary judgment is denied as to Count III, and the issue will be submitted to a jury.

## CONCLUSION

The Court does not deny that Comeau failed to do his due diligence in evaluating the prospects of success of its proposed Florida franchise.  The Court also does not believe that Comeau's reliance on McKinney's representations was the sole reason for the failure of the HEI franchise.  However, genuine issues of material fact remain as to whether McKinney's representations rise to the level of negligent misrepresentation or a violation of the Florida Franchise Act.  It continues to be the Court's view that Plaintiff will have a difficult time prevailing in any significant way if this case proceeds to trial.

Both parties bear some responsibility for this situation, and it is difficult for the Court to see how a trial would be in the interests of either party versus settlement of the case.  At this stage, the Court denies McKinney's motion for summary judgment on Plaintiff's negligent misrepresentation and FFA claims, and grants McKinney's motion for summary judgment with regard to Plaintiff's fraud claim.

## ORDER

Based on the files, records, and proceedings herein, and for the reasons set forth above, **IT IS HEREBY ORDERED** that:

1.     Defendant Brian McKinney's Motion for Summary Judgment (Doc. No. [86]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.     Defendant McKinney is not entitled to summary judgment as to Count III (Violation of the Florida Franchise Act) of the First Amended Complaint.

b.     Defendant McKinney is entitled to summary judgment as to Count IV (Fraud) of the First Amended Complaint.

c.     Defendant McKinney is not entitled to summary judgment as to Count V (Negligent Misrepresentation) of the First Amended Complaint.


Dated:  January 10, 2012                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            United States District Judge